UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

LLOYD SHUGART, dba CLASSIC YACHT SYSTEMS,

Plaintiff,

v.

GYPSY Official No. 251715, its Engines, Machinery, Appurtenances, etc.,
*In Rem*;

And

MARC FLEMING,
*In Personam*,

Defendants.

Case No. C14-1923RSM

ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION TO AMEND ANSWER

## I. INTRODUCTION

This matter comes before the Court on Plaintiff Lloyd Shugart's Motion for Summary Judgment, Dkt. #47, and on Defendant Marc Fleming's Motion to Re-Amend Answer and Counterclaim, Dkt. #48. Plaintiff argues that there are no genuine issues of material fact in this matter, other than a dispute over a 40% markup on parts and determining appropriate attorney fees. Dkt. #40. Defendant disagrees with Plaintiff's version of the facts and moves to amend

his Answer to include a Consumer Protection Act ("CPA") claim. Dkt. ## 48, 56. For the reasons set forth below, the Court GRANTS IN PART Plaintiff's Motion for Summary Judgment and DENIES Defendant's Motion to Re-Amend Answer and Counterclaim.

## II. BACKGROUND

This action arises out of a dispute over charges and payment for electrical service work that Plaintiff Lloyd Shugart performed on Defendant vessel Gypsy. On October 18, 2013 10:00 am, Defendant Marc Fleming and Shugart met on board the Gypsy to examine the vessel's wiring. Dkt. #47-3 at 7 (Deposition of Marc Fleming ("Fleming Dep."), 60-62, 77:3). Shugart's investigation determined that two batteries were cracked and would need to be replaced, as two of the four batteries had been overcharged and split their cases, causing a loss of acid. *Id.* at 10-11 (Fleming Dep. at 63-64); Dkt. #47-2 at 2. Shugart also shared his opinion that the vessel's wiring should be looked at and was unsafe. Dkt. #47-3 at 12 (Fleming Dep. at 65:6-20). Fleming alleges that during the parties' initial meeting aboard the Gypsy, he asked Shugart what it would cost generally to rewire the boat, and Shugart told him "it could go as high as $35,000." *Id.* at 16 (Fleming Dep. at 77:6-13). Shugart denies making such a statement, but accepts it as true for purposes of his Motion. Dkt. #47 at 3.

Later that same day, Fleming sent a text message to Shugart. The text stated:

> L: You met me on the GYPSY this morning. I know you're busy but if you could get numbers for your time-Dyno replacement and the correct charger ASAP maybe we can figure out how to get keys to you before I leave. I'm thinking we use this as a test project for the larger wiring project to see how it all goes. Please advise. Marc/Gypsy.

Dkt. #47-2 at 3.

On October 22, 2013, the parties entered into a verbal contract to start "Phase 1" of the electrical work on the Gypsy. Dkt. #47-2 at 4. The parties agree that this contract was a "time

and materials contract at a labor rate of $85 per hour" and "was not a bid or firm price contract." *Id.* Communications between the parties indicate that they operated on the premise that Fleming would pay up front for parts without being charged a mark up, and that labor charges would not be billed or collected until the final invoice. *See* Dkt. #47-3 at 53 (Fleming Dep. at 172:11-14); Dkt. #47-3 at 57-58; Dkt. #47-3 at 65-68; Dkt. #47-5 at 2-3. Fleming agreed to pay the cost of parts prior to starting the first phase of the work and to provide additional monies to cover additional costs as the project progressed. Dkt. #47-2 at 3-4; Dkt. #47-3 at 24 (Fleming Dep. at 86:6-8). Shugart contends that he agreed to provide parts at cost, on the condition that the final invoice was paid in full 30 days net; otherwise, parts would be marked up 40% after 30 days. Dkt. #47 at 3. This 40% markup is contested by Fleming. *Id.*

Shugart agreed to start work on October 28, 2013. Dkt. #47-5 at 3. Fleming issued a check in the amount of $4,000.00 to cover the initial parts pursuant the agreement. *Id.*; Dkt. #47-2 at 4. The next day, after removing the vessel's batteries and charger, Shugart determined that battery acid leaked out down the top and side of the fuel tank causing corrosion to the top and sides of the fuel tank. Dkt. #47-5 at 3-4; Dkt. #47-3 at 19 (Fleming Dep. at 80:2-9).

With Fleming's approval, over the course of the next few days, Shugart arranged an estimate for the pumping of the tank and associated repair, if necessary. Dkt. #47-3 at 19-20 (Fleming Dep. at 80:16-81:2); Dkt. #47-5 at 4. Shugart informed Fleming that he needed to mail a check to cover the costs and Fleming agreed. Dkt. #47-5 at 4. Shugart scheduled the fuel tank repair for November 6, 2013. *Id.*

On October 30, 2013, Shugart discovered that the Gypsy's "inverter was wired with improper wire, and of size, lacked any fuses or circuit breakers, and the existing wires were running through the bilge which was subject to flooding." Dkt. #47-5 at 4. Shugart telephoned

Fleming and advised him that "the new inverter/charger combination could not be installed without running new proper wires along the path of the hull above the bilge…. the existing circuit breaker panel, a non-marine mobile home panel, could not support the inverter/charger, and that a new marine circuit breaker panel needed to be installed." *Id.* Shugart suggested that "a new panel be added in a configuration that would temporarily support the new inverter/charger, and allow for the eventual total rewire of all of the associated AC circuits onboard [the Gypsy]." *Id.; see also* Dkt. #57-1 at 5. Shugart advised Fleming that it would be more efficient for him to accelerate "Phase 2," described by Shugart as "the complete AC circuit rewire," to move along simultaneously with the installation of Phase 1, "the new inverter/charger and AC circuit breaker panel." Dkt. #47-5 at 5. The parties agree that they had multiple discussions over the telephone, and Fleming authorized that "Phase one and two" would be accomplished simultaneously. Dkt. #47-2 at 5.

On November 6, 2013, the cleaning and repair of the fuel tank began at 9:00 a.m. and was completed at 7:30 pm that evening. *Id.*

On or around November 8, 2013, Shugart sent Fleming pictures of another yacht, the same make and model of boat as the Gypsy, that Shugart had rewired. Dkt. #47-3 at 21-22 (Fleming Dep. at 82:14-83:3). Fleming responded on November 11, 2013, saying: "Got the pictures. The work looks excellent and expensive." *Id.*; Dkt. #47-3 at 58.

On November 12, 2013, Shugart sent Fleming an email breaking down how the previous $4,000 parts deposit had been spent. Dkt. #47-3 at 23 (Fleming Dep. at 85:1-12); Dkt. #47-3 at 57-58. Shugart also explained that he has advanced an additional $2,469 that needs to be paid by Fleming. Shugart reminded Fleming that: "[g]oing forward, I need to collect upfront

for all parts as we discussed. I don't mark-up parts or 3rd party services I really can't afford to finance them [sic]." Dkt. #47-3 at 57-58.

On November 13th Shugart gave Fleming the price for the new AC panel he had designed. Dkt. #47-3 at 57. On November 14, 2013, Shugart received an email from Fleming telling him to order the panel, stating that there was "[n]ot much choice on the [AC] panel I'm guessing so we need to move ahead." Dkt. #47-2 at 6; Dkt. #47-3 at 25 (Fleming Dep. at 90:12-24); Dkt. #47-3 at 59. From November 21, 2013 to January 23, 2014, Shugart performed electrical work aboard the Gypsy, and phase one and two were completed on January 23, 2014. Dkt. #47-5 at 6.

On December 27, 2013, Shugart sent Fleming a labor and parts log, listing 89 hours of labor. Dkt. #47-3 at 26 (Fleming Dep. at 103:11-23); Dkt. #47-3 at 65-66. Fleming testified that this parts and labor log indicated that all of the money he had paid as a deposit so far had been applied to parts, and nothing had been applied to labor. Dkt. #47-3 at 26 (Fleming Dep. at 103:11-23).

On December 30, 2013, Shugart sent a "project status" email to Fleming. Dkt. #47-3 at 67. In the second line of the email, Shugart informed Fleming that he "can only guest (sic) the hrs (sic) to finish the AC. It's a boat and access drives the hrs, going forward, just as it has to date." *Id*. Shugart explained how the 89 hours spent to date had been spent working on the electrical systems and fuel tank, and clarified that he was working at $85 an hour and not the $95 per hour repeated by Fleming. *Id*. Further down in the email, Shugart gave Fleming a breakdown of the AC work remaining and told Fleming that the "remaining work guesstimate is exactly that, it is not a bid. It is based on prior project experience. Something's may take more or less time." *Id*. Shugart further explained that "in the end this will be a job done right. I

endeavor to work as efficiently as possible. It will cost what it costs in parts and labor to be done right." *Id.* at 68.

From the beginning and through the completion of Phases One and Two on January 23, 2014, Fleming was required to replenish the retainer for parts with additional funds on four separate occasions in the total amount of $14,000. The last of these payments was made on January 8, 2014 in the amount $5,500 and covered the retainer deficiency for AC parts, as well as provided new monies to move ahead with Phase Three, the DC electrical works. Dkt. #47-5 at 6-7.

Between October and January, Shugart advised Fleming of problems associated with the DC electrical systems aboard the Gypsy. Dkt. #47-2 at 6. In early January 2014, Fleming specifically authorized Phase Three to start after completion of the AC electrical work. *Id.* at 7. Fleming visited and stayed aboard the Gypsy on several occasions during this time, including January 24-26, 2014, and inspected the work completed by Shugart. *Id.* at 6. Shugart and Fleming had multiple discussions on the need to provide new monies for the parts retainer, as well as the amount of labor hours accruing. Shugart advised Fleming that the general average was about 30-35 hours of billable time per week. Dkt. #47-3 at 32-33 (Fleming Dep. at 117:22-25; 118:10-22).

From February 12, 2014 through June 3, 2014, Shugart worked on Phase Three. Dkt. #47-5 at 7. This phase initially included rewire of all DC circuits between the engine panel at the lower vessel helm and parallel panel at the fly-bridge helm to the engine room bulkhead. *Id.* It also included new house DC circuits for lighting, pumps and motors. *Id.* This rewiring of the engine room was not part of the original anticipated scope of Phase Three. Dkt. #47-3 at 43 (Fleming Dep. at 138:11-15). Early in May 2014, while preparing to hook up the new

busing boards to the batteries and the pair of engines, it was discovered that the engine room would also need a complete re-wire, and Fleming authorized this work. Dkt. #47-2 at 8. RFA #36. New engine harnesses were built in Shugart's shop and installed to the engines and busing; all battery and alternator cables were replaced with proper cables, fuses, and switching. Dkt. #47-5 at 7-8. Again, Fleming stayed aboard the Gypsy on several occasions during this phase of the project, and Shugart and Fleming had multiple telephone conversations, as well as texts and emails. *Id.* Fleming approved all work, including new work to be done, specifically including the engine room work. Dkt. #47-3 at 54 (Fleming Dep. 174:20-22) ("Q. Did Mr. Shugart do any work on the GYPSY without your authorization? A. Not that I'm aware of."). Fleming was required to deposit new monies to fund the parts retainer on two more occasions during Phase Three in the total amount of $12,500. Dkt. #47-5 at 7-8.

Fleming terminated the contract as of June 3, 2014, with the job 99% complete from the perspective of Shugart. Dkt. #47-5 at 8. Shugart sent Fleming a final invoice along with all accounting, including labor charges, on June 4, 2014. *Id.* Fleming refused to pay the charges and demanded that all of the monies he paid for parts costs be returned to him. *Id*; Dkt. #47-3 at 40 (Fleming Dep. at 134:9-23). Fleming has made no complaint about the quality of Shugart's electrical work on the Gypsy. Dkt. #47-3 at 34 (Fleming Dep. at 120-21, 124). Similarly, other than a $982.83 charge which Shugart has conceded was a duplicate billing entry, Fleming has no issue concerning whether the AC and DC parts he paid for went into the Gypsy. *Id.* at 50-52 (Fleming Dep. at 153:3-155:5).

Fleming contends that Shugart took the Gypsy's steering wheels off the vessel when he left the job in June 2014. Dkt. #57-1 at 14. Shugart contends that he took the steering wheels off the boat in February "to gain access to perform the electrical repairs… and took them to my

shop for safe keeping." Dkt #47-5 at 7. Nevertheless, the steering wheels were returned and received by Fleming no later than July 18, 2014. Dkt. #19 at 30.

On December 18, 2014, Plaintiff filed his Verified Complaint to Foreclose Maritime Lien *In Rem* in admiralty, stating claims for breach of maritime contract, maritime lien for providing a necessary, and for reasonable value of labor and services. Dkt. #1. On February 20, 2015, Defendant Marc Fleming filed his Answer, which included counterclaims for conversion and violation of the Washington Consumer Protection Act ("CPA"). Dkt. #14. On March 3, 2015, Plaintiff filed a Motion to Dismiss just the CPA counterclaim under Rule 12(b)(6), and the Court dismissed that claim without prejudice on May 1, 2015. Dkt. #26. Defendant filed an amended Answer on May 11, 2015, expanding on their CPA counterclaim but leaving their counterclaim of conversion undisturbed. Dkt. #29. Plaintiff again moved to dismiss this claim on July 30, 2015. Dkt. #41. Discovery closed in this matter on September 28, 2015. Dkt. #23. On October 20, 2015, the Court again dismissed Defendant's CPA counterclaim. Dkt. #46. The dispositive motion deadline in this matter passed on October 27, 2015, Dkt. #23, and Plaintiff filed his instant Motion for Summary Judgment on that day. Dkt. #47. Two days later, on October 29, 2015, Defendant filed the instant Motion to Re-Amend Answer and Counterclaim. Dkt. #48.

## III. DISCUSSION

### A. Legal Standard on Summary Judgment

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Material facts are those which might affect the outcome of the suit under governing law. *Anderson*, 477 U.S. at

248. In ruling on summary judgment, a court does not weigh evidence to determine the truth of the matter, but "only determine[s] whether there is a genuine issue for trial." *Crane v. Conoco*, Inc., 41 F.3d 547, 549 (9th Cir. 1994) (citing *Federal Deposit Ins. Corp. v. O'Melveny & Meyers*, 969 F.2d 744, 747 (9th Cir. 1992)).

A factual dispute is "genuine" if the evidence is such that reasonable persons could disagree about whether the facts claimed by the moving party are true. *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983). The "party opposing summary judgment must direct [the court's] attention to specific, triable facts," *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003), and the reviewing court is "not required to comb through the record to find some reason to deny a motion for summary judgment," *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (quoting *Forsberg v. Pac. Nw. Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir. 1988)). "The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991). Allowing "'a party who has been examined at length on deposition . . . to raise an issue of fact simply by submitting an affidavit contradicting prior testimony would greatly diminish the utility of summary judgment.'" *Id.* at 266 (quoting *Foster v. Arcata Associates*, 772 F.2d 1453, 1462 (9th Cir. 1985)).

The Court must draw all reasonable inferences in favor of the non-moving party. *See O'Melveny & Meyers*, 969 F.2d at 747, *rev'd on other grounds*, 512 U.S. 79 (1994). However, the nonmoving party must make a "sufficient showing on an essential element of her case with respect to which she has the burden of proof" to survive summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Further, "[t]he mere existence of a scintilla of evidence in

support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 251.

**B. Summary Judgment Analysis**

**a. Maritime Lien for Necessities**

46 U.S.C. § 31342 provides:

> (a) Except as provided in subsection (b) of this section, a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner—
> (1) has a maritime lien on the vessel;
> (2) may bring a civil action in rem to enforce the lien; and
> (3) is not required to allege or prove in the action that credit was given to the vessel.
> (b) This section does not apply to a public vessel.

In order to establish a maritime lien for necessaries, a supplier must show: "(1) that the goods or services were provided to the vessel; (2) that the goods or services were 'necessaries'; (3) that the charges are reasonable in amount; and (4) that they were ordered by someone with the appropriate authority." *Richmond Bay Marina, LLC v. Vessel "Relax"*, 2013 U.S. Dist. LEXIS 179132, *14, 2013 WL 6699976 (N.D. Cal. Dec. 19, 2013) (citing *Belcher Co. of Alabama, Inc. v. M/V Maratha Mariner*, 724 F.2d 1161, 1164 (5th Cir. 1984); *Int'l Seafoods of Alaska, Inc. v. Park Ventures, Inc.*, 829 F.2d 751, 753 (9th Cir. 1987); *Farwest Steel Corp v. Barge Sea Span 241*, 769 F.2d 620, 623 (9th Cir. 1985)). Modern admiralty jurisprudence interprets "necessaries" as anything that facilitates or enables a vessel to perform its mission or occupation. See *Ventura Packers, Inc. v. F/V Jeanine Kathleen,* 305 F.3d 913, 923 (9th Cir. 2002). "The term 'necessaries' includes most goods or services that are useful to the vessel to keep her out of danger." *Id*. The reasonableness of charges in the maritime lien context is measured by whether they are "customary" and "in accord with prevailing charges for the work done and the materials furnished." *Sweet Pea Marine, Ltd. v. APJ Marine, Inc.*, 411 F.3d 1242,

1249, (11th Cir. 2005) (citing *Ex parte Easton*, 95 U.S. 68, 77 (1877) and *Shelly Tractor & Equip. Co. v. The Boots*, 140 F.Supp 425, 426 (E.D.N.C. 1956)).

It is undisputed that Shugart provided goods and services to the vessel Gypsy in the form of parts and electrical repairs. These goods and services clearly qualify as necessaries, as the record shows that the parties agreed that the repairs were needed for safety reasons. It is also undisputed that all of the goods and services were ordered by Fleming, who had the authority. *See* Dkt. #47-3 at 54 (Fleming Dep. 174:20-22) ("Q. Did Mr. Shugart do any work on the GYPSY without your authorization? A. Not that I'm aware of.").

The only element in dispute is thus whether Shugart's charges were a reasonable amount. The Court finds that there are no genuine issues of material fact that would preclude the Court's judgment in this matter. The record establishes that Fleming agreed to the price of the parts and the hourly wage for labor. *See* Dkt. #47-2 at 4. The record establishes that the verbal contract entered into by the parties was not for a bid or firm price, but for work at an hourly rate. *See id.* Plaintiff has satisfactorily established that the rate of $85 per hour is in accord with prevailing charges for the work done and the materials furnished. *See* Dkt. #47 at 13; Dkt. #47-7 at 3.[1] The record is full of communications between the parties where Shugart informs Fleming that the work will take as long as necessary to be done satisfactorily, without protestation from Fleming. Fleming's main argument against the reasonableness of the final price of Shugart's services is a statement made by Shugart in their initial meeting that "it could go as high as $35,000." *Id.* at 16 (Fleming Dep. at 77:6-13). The Court concludes that this statement, if made, was a part of preliminary negotiations, indefinite, and not a part of the final

[1] Defendant contests the reasonableness of the rate charged by Shugart, citing generally and without citation to "the declarations of Defendant Marc Fleming and defense expert Charles Life." Dkt. #56. The Court notes that the "party opposing summary judgment must direct [the court's] attention to specific, triable facts," *S. Cal. Gas Co.*, *supra*, and the reviewing court is "not required to comb through the record to find some reason to deny a motion for summary judgment," *Carmen, supra.* Defendant has not established a question of material fact exists as to the reasonableness of the $85 per hour rate charged by Shugart and definitively agreed to by Fleming.

verbal contract made days later. Furthermore, as the work progressed and Shugart kept Fleming informed, Fleming's silence on the matter constituted consent to continue past this initial estimate. For all of these reasons, the Court concludes that the charges in dispute were reasonable, and thus Shugart has a valid maritime lien for necessaries under 46 U.S.C. § 31342.

**b. Breach of Maritime Contract Claim**

To recover damages for breach of a maritime contract, "a plaintiff must prove (1) the terms of a maritime contract; (2) that the contract was breached; and (3) the reasonable value of the purported damages." *Sweet Pea Marine*, 411 F.3d at 1249 (citing *Exxon Corp. v. Cent. Gulf Lines, Inc.*, 500 U.S. 603, 605-06, 111 S.Ct. 2071 (1991).

The existence of a verbal contract has been stipulated by the parties. Dkt. #47-2 at 4. The parties agree that this contract was a "time and materials contract at a labor rate of $85 per hour" and "was not a bid or firm price contract." *Id.* Communications between the parties indicate that they operated on the premise that Fleming would pay up front for parts without being charged a mark up, and that labor charges would not be billed or collected until the final invoice. *See* Dkt. #47-3 at 53 (Fleming Dep. at 172:11-14); Dkt. #47-3 at 57-58; Dkt. #47-3 at 65-68; Dkt. #47-5 at 2-3. Fleming agreed to pay the costs of parts prior to starting the first phase of the work and to provide additional monies to cover additional costs as the project progressed. Dkt. #47-2 at 3-4; Dkt. #47-3 at 24 (Fleming Dep. at 86:6-8).

The breach of this contract occurred when Fleming failed to pay Shugart for his labor, and the fact this payment has not occurred is not disputed. Fleming's dispute is in the reasonable value of the purported damages, *i.e.* he does not believe that the final bill is reasonable. However, as demonstrated above, the record shows that Fleming agreed to the terms of the contract and was kept informed of developments on the project that extended and

expanded the amount of labor necessary. There is no evidence in the record that Shugart did not work the hours claimed, or that his work in some way violated the terms of the contract. As such, summary judgment is appropriate on Shugart's breach of contract claim, and Shugart is entitled to recover damages in the amount of unpaid charges under the terms of the parties' agreement, not including the disputed 40% markup for parts. Plaintiff has calculated these damages as $47,854.19. Dkt. #47-5 at 10.

**c. Defendant's Conversion Claim**

Shugart argues that he is entitled to summary judgment on Fleming's counterclaim of conversion. Dkt. #47 at 21. Shugart admits that he detached the Gypsy's steering wheels, and argues that he was entitled to do so to secure his maritime lien. *Id*. Shugart cites to Washington State law for the premise that "[c]onversion is the unjustified, willful interference with a chattel which deprives a person entitled to the property of possession," *Potter v. Wash. State Patrol*, 165 Wash.2d 67, 78 196 P.3d 691, 698 (2008), and that "[a]bsent willful misconduct, the measure of damages for conversion is the fair market value of the property at the time and place of conversion," *id.* at 79. Dkt. #47 at 21. Shugart argues that his taking of the steering wheels was not "unjustified" because, under Washington State law, he had a common law lien on the Gypsy for the debt owed by Fleming because "a person performing labor on a chattel at the owner's request has a common law possessory lien for the debt so long as the lienor retains possession of the chattel." *Burns v. Miller*, 107 Wash.2d 778, 780 (1987). In *Burns*, the lienholder was a marine repair corporation in possession of the chattel at issue, a sailboat, through the duration of the dispute. *Id.* at 779.

The Court finds that Shugart has not established that the conversion claim must be dismissed as a matter of law. The circumstances surrounding Shugart's taking of the steering

wheels, and whether he was entitled or justified to do so when he did, are in dispute and constitute genuine issues of material fact. Furthermore, the Court is not satisfied that the Washington State law cited by Shugart is applicable to a maritime case. Certainly, Shugart has not established that he retained *possession* of the Gypsy such that he would have a possessory lien that would enable him via *Burns* to remove parts from the Gypsy, or that a statutory lien under RCW 60.08.010 would somehow permit him to remove parts from the Gypsy. Shugart's citation to *Paris American Corp. v. McCausland*, 52 Wn. App. 434 (1988) is equally inapplicable to the facts at issue in this matter.

However, the Court notes that the potential damages for the conversion claim are very small. As Shugart notes in his Reply brief, "Fleming has presented no evidence that he could not use a $300 replacement wheel." Dkt. #59 at 12. The Court believes the proper measure of damages for this claim is the cost of replacing the allegedly converted material for the period of loss, not the cost of chartering an entirely new vessel, as the Gypsy was still available to Fleming.

**d. Remaining Issues**

Shugart does not move for summary judgment on the issue of whether the verbal contract contained as a term that parts provided would be marked up 40% if the final invoice was not paid. *See* Dkt. # 1 at 4; Dkt. #47 at 3 n.2. Shugart also requests that the issue of attorneys fees owed in this matter be reserved and a briefing schedule be set by the Court on that issue. Dkt. #47 at 24.

**C. Motion to Re-Amend Answer**

Five factors are commonly assessed before granting leave to amend: (1) bad faith, (2) undue delay, (3) prejudice to the opposing party, (4) futility of amendment, and (5) whether the

party has previously amended the pleading. *See Allen v. City of Beverly Hills*, 911 F.2d 367, 373 (9th Cir. 1990). Futility alone can justify a court's refusal to grant leave to amend. *Novak v. United States*, 795 F.3d 1012, 1020, (9th Cir. 2015) (citing *Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995)).

Defendant's Motion fails to comply with LCR 15(a)'s requirement to redline changes in the proposed amended pleading.[2] Furthermore, Defendant's Motion, filed after discovery closed in this matter and after the dispositive motion deadline, contains entirely new factual allegations not disclosed in discovery, thus prejudicing Plaintiff's ability to investigate or respond. *See* Dkt. #48-1; Dkt. #53 at 5. Additionally, the proposed amended answer's new CPA claim relies on a single anecdote of Shugart estimating a cost of "$20,000 to 25,000" for electrical work on another vessel "but the final bill was $48,719.55." Dkt. #48-1 at 8. The proposed amended answer goes on to claim that "For both defendant Fleming and the owner of [the other vessel], plaintiff failed to offer any hint whatsoever while the work was proceeding that the bill would be higher than the original cost estimates, notwithstanding the fact that both defendant Fleming and the owner of the other [vessel] based their decisions to allow plaintiff to proceed with the electrical work on their boats on the cost estimates plaintiff made at the beginning." *Id.* at 8-9. The Court is not convinced that this single anecdote of overbilling can create a "public interest impact," and, for the same reasons discussed above, this new CPA claim does not allege facts sufficient to show that Shugart engaged in an unfair or deceptive act or practice. Given the elements of a CPA claim that the parties are already familiar with from *Columbia Physical Therapy, Inc. v. Benton Franklin Orthopedic Assocs., PLLC*, 168 Wn.2d

[2] The Court notes that Defendant has attempted to correct this error by attaching a second proposed amended Answer to a declaration in support of his Reply brief. *See* Dkt. #55.

421, 442 (2010), the Court concludes that this claim would be futile. For all of these reasons, the Court will deny Defendant's Motion to Re-Amend Answer.

## IV. CONCLUSION

Having reviewed the relevant pleadings, the declarations and exhibits attached thereto, and the remainder of the record, the Court hereby finds and ORDERS:

1) Plaintiff's Motion for Summary Judgment is GRANTED IN PART as described above.

2) Plaintiff is entitled to damages for breach of contract as described above. The total amount of damages for breach of contract and Defendant's conversion claim remain as issues for trial.

3) Defendants' Motion to Re-Amend Answer is DENIED.

4) The Court will contact the parties to schedule a telephonic status conference to discuss remaining issues in this case.

DATED this 4 day of January, 2016.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE